1   ROBBINS ARROYO LLP
    BRIAN J. ROBBINS (190264)
2   brobbins@robbinsarroyo.com
    ASHLEY R. RIFKIN (246602)
3   arifkin@robbinsarroyo.com
    600 B Street, Suite 1900
4   San Diego, CA 92101
    Telephone: (619) 525-3990
5   Facsimile: (619) 525-3991

6   Attorneys for Plaintiff

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11   WENDUO GUO, Derivatively on Behalf of      ) Case No.
     GOPRO, INC.,                               )
12                                              )
                         Plaintiff,             ) VERIFIED STOCKHOLDER DERIVATIVE
13                                              ) COMPLAINT FOR VIOLATIONS OF
          v.                                    ) SECURITIES LAW AND BREACH OF
14                                              ) FIDUCIARY DUTY
     NICHOLAS WOODMAN, BRIAN MCGEE,             )
15   ANTHONY BATES, EDWARD GILHULY,             )
     KENNETH GOLDMAN, PETER GOTCHER,            )
16   ALEXANDER LURIE, MICHAEL MARKS,            )
     LAUREN ZALAZNICK, SUSAN LYNE, and          )
17   RICK WELTS,                                )
                                                )
18                       Defendants,            )
                                                )
19        -and-                                 )
                                                )
20   GOPRO, INC., a Delaware corporation,       )
                                                )
21                       Nominal Defendant.     )
                                                ) DEMAND FOR JURY TRIAL
22   _____)

23

24   **REDACTED VERSION OF PORTIONS OF DOCUMENT SOUGHT TO BE SEALED**

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    Plaintiff Wenduo Gou, by and through his undersigned counsel, brings this Verified

2 Stockholder Derivative Complaint for Violations of Securities Law and Breach of Fiduciary

3 Duty on behalf of nominal defendant GoPro, Inc. ("GoPro" or the "Company") against certain

4 directors and/or officers of GoPro.  Plaintiff bases his allegations on personal knowledge as to

5 his own acts, and on information and belief as to all other allegations, based upon due

6 investigation by counsel, including, but not limited to: (i) documents and other information

7 obtained from the Company pursuant to section 220 of the Delaware General Corporation Law, 8

8 *Del. C.* §220 (the "Section 220 Production"); (ii) review and analysis of public filings made by

9 the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases,

10 financial statements, and other publicly available sources; (iii) review of court filings in the

11 related consolidated securities class action lawsuits alleging violations of the federal securities

12 law based on similar facts and circumstances alleged herein, styled *Larkin v. GoPro, Inc., et al.*,

13 No. 4:16-cv-06654-CW (the "2016 Securities Action"),[1] which is currently pending in the United

14 States District Court for the Northern District of California; and (iv) review of court filings in the

15 related securities class action lawsuits alleging violations of the federal securities law based on

16 similar facts and circumstances alleged herein, styled *Park v. GoPro, Inc., et al.*, No. 3:18-cv-

17 00193-EMC; *Dye v. GoPro, Inc., et al.*, No. 3:18-cv-00248-WHA; *Arora v. GoPro, Inc., et al.*,

18 No. 3:18-cv-00265-WHO; and *Ladd v. Woodman, et al.*, No. 5:18-cv-00533-EJD (collectively,

19 the "2018 Securities Actions") which are also currently pending in the United States District

20 Court for the Northern District of California.

21

22

23 _____

24 [1] When the 2016 Securities Action was filed, it was styled *Bielousov v. GoPro, Inc. and Nicholas D. Woodman*, No. 4:16-cv-06654-CW (N.D. Cal.).  After another stockholder was appointed

25 lead plaintiff, the suit was restyled as *Larkin v. GoPro, Inc., et al.*, and added Brian McGee and Anthony Bates as named defendants, with the filing of an Amended Class Action Complaint on

26 March 14, 2017.  Following the issuance of the Order Denying Motion to Dismiss First Amended Complaint on July 26, 2017, the lead plaintiff in the 2016 Securities Action filed a

27 Second Amended Complaint on August 4, 2017 (the "2016 Securities Action Complaint").

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiff, a stockholder of GoPro, on behalf of the Company against the Individual Defendants (as defined herein). Plaintiff seeks to remedy the Individual Defendants' violations of state and federal law during the relevant period that have caused and continue to cause substantial monetary losses to GoPro and other damages, including damages to its reputation and goodwill.

2.     During the relevant period, the Individual Defendants caused or allowed GoPro to issue or make materially false and misleading statements concerning the Company's business operations, inventory, and financial condition.  Additionally, the Individual Defendants caused or allowed GoPro to file false and misleading statements with the SEC.

3.     GoPro is a consumer electronics company that develops mountable and wearable cameras, drones, and related accessories.  The Company sells its products primarily through its website, as well as through retailers, and wholesale distributors.

4.     After it made a splash with its wearable camera, investors and analysts were anxious to see what the Company had in store next.  GoPro responded by claiming that it planned on entering the drone market in mid-year 2016.  Powered by its entrance to the chrome market on February 3, 2016, GoPro issued earnings guidance that the Company would bring in $1.35 billion to $1.5 billion in revenue for fiscal year 2016.

5.     During an Investor Day conference call held on September 19, 2016, defendant Brian McGee ("McGee"), GoPro's Chief Financial Officer ("CFO"), told investors that GoPro remained "on track" to meet that revenue guidance, and that GoPro's new drone, Karma, as well as its new HERO5 line of cameras would take GoPro to new heights.

6.     GoPro represented that the HERO5 cameras would be available on October 2, 2016, and that the Karma drone would be available on October 23, 2016.  GoPro's strategy was to leverage these new product launches during the holiday season to grow revenue and return to profitability 2016.  The "vast majority" of its 2016 revenue was to come from these launches.

7.     The truth was, however, that GoPro was suffering a severe shortage of Karma drones and HERO5 cameras that would make it impossible to meet its guidance.  At that time,

1  GoPro had at most 2,500 drones available to sell during the critical holiday period—meaning the
2  most Karma could generate in revenues was approximately $2 million.  GoPro had led the
3  market to believe that GoPro would need to sell nearly 100,000 units to meet its guidance.
4  Likewise, GoPro also experienced a supply shortage with its HERO5 line of cameras caused by
5  difficulty with making the camera waterproof.

6       8.     Thus, on the scheduled launch dates, consumers were confronted with the
7  unavailability of these new products.  Customers expressed their frustration publicly to GoPro,
8  especially regarding the Karma drone.  For instance, on the day of the Karma's launch, October
9  23, 2016, several users posted to GoPro's customer service website, its Support Hub, and GoPro's
10 Facebook page lamenting the unavailability of the drone.

11      9.     On October 24, 2016, *TheStreet, Inc*. published the results of availability checks
12 conducted by analysts at Longbow Research.  Despite its importance to the Company, the article
13 noted that the shipment date for the vast majority of Karma drones was moved from October 23,
14 2016 to November 28, 2016, that the HERO5 camera supply was low, and that retailers received
15 few restocks of the HERO5 cameras since receiving initial shipments on October 2nd.  As a
16 result, the price of GoPro's stock immediately fell $1.05 per share, or about 7% from the
17 previous trading day's closing price of $14.93 per share, to close at $13.88 per share,
18 representing a market cap loss of over $146 million.

19      10.    Shortly thereafter, some of the few customers who were able to purchase a Karma
20 drone began reporting that their drones were inexplicably falling out of the sky.  Apparently, this
21 was because GoPro's Karma drone had a significant design defect—an ill-fitting battery latch—
22 that resulted in the few drones that had been sold to be recalled on November 8, 2016 and
23 removed from market during the key holiday period.  In fact, the Karma drone was not
24 reintroduced to the market until February 1, 2017.  This, of course, negated whatever chance
25 GoPro had of being profitable that fiscal year.

26      11.    On February 2, 2017, GoPro reported its fourth quarter and full year 2016
27 revenues.  To the dismay of investors, GoPro missed its guidance, reaching revenue of only
28 $1.18 billion for the year and $540 million for the fourth quarter.  While GoPro had earlier tried

to minimize the effect of its Karma drones, the Company finally admitted that the Karma drone was the "biggest challenge to [its] quarterly revenue."  However, the improper statements about the Karma drone and HERO5 cameras did not stop.

12.     On April 27, 2017, GoPro's Chief Executive Officer ("CEO"), defendant Nicholas Woodman ("Woodman") claimed that "GoPro is executing a turnaround," and touted that the Karma drone relaunch was off to a strong start.  The Company's revenue guidance for the second quarter was $270 million +/- $10 million.

13.     Defendant Woodman made even more sanguine statements on August 3, 2017, when discussing the Company's second quarter 2017 results, claiming that GoPro was "building momentum," experiencing "[s]trong demand" and "continu[ing] to track toward [its] goal of full-year, non-GAAP profitability in 2017."

14.     In September 2017, GoPro introduced HERO6 line of cameras at $499.99.  When the HERO6 was introduced, the HERO5 line of cameras all dropped in price by $100.  But, positive statements regarding HERO5 cameras and the Karma drone continued through the fall of 2017.

15.     With the Company's stock price inflated by the public's belief that the statements made after the relaunch of the Karma drone were true, defendants Woodman, McGee, and Anthony Bates ("Bates"), a member of the Board of Directors (the "Board") sold substantial amounts of their GoPro stock.

16.     On January 8, 2018, it was revealed to the market that the Company's fourth quarter 2017 sales were $340 million—well below analysts' projections of over $470 million. The reasons given were the drastic price cutting of the Company's HERO cameras and Karma drone due, in part, to the decision to exit the drone market altogether.

17.     ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

18.     As a result of this wrongdoing, GoPro, Woodman, McGee, and Bates are listed as defendants in the 2016 Securities Action and GoPro, Woodman, and McGee are listed as defendants in the 2018 Securities Actions.  The plaintiff in the 2016 Securities Action has since survived a motion to dismiss, such that GoPro, Woodman, McGee, and Bates all face a substantial likelihood of liability in that action, as GoPro, Woodman, and McGee do in the 2018 Securities Actions and all of the Individual Defendants in the instant action.

## JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

20.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) GoPro maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to GoPro, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INTRADISTRICT ASSIGNMENT

22.     A substantial portion of the transactions and wrongdoings that gave rise to the claims in this action occurred in the County of San Mateo, and as such, this action is properly

- 5 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    assigned to the Oakland division of this Court.

2                                **THE PARTIES**

3    **Plaintiff**

4           23.    Plaintiff Wendo Guo was a stockholder of GoPro at the time of the wrongdoing

5    complained of, has continuously been a stockholder since that time, and is a current GoPro

6    stockholder.

7    **Nominal Defendant**

8           24.    Nominal defendant GoPro is a Delaware corporation with principal executive

9    offices located at 3000 Clearview Way, San Mateo, California.  Founded in 2004 and

10   incorporated in August 2011 under the name Woodman Labs, Inc., the Company changed its

11   name to GoPro, Inc. in April 2014, and shares of its stock began trade publicly on the NASDAQ

12   Global Select Market ("NASDAQ") at $24 under the ticker symbol "GPRO" after the Company's

13   initial public offering on June 26, 2014.

14   **Defendants**

15          25.    Defendant Woodman founded GoPro in 2004.  Woodman has served as the

16   Company's Chief Executive Officer ("CEO") and member of the Board since 2004, as Chairman

17   since 2014 and as President from 2004 until 2014.  For fiscal years 2014 to 2016, in exchange for

18   his purported trust, loyalty, and fidelity to GoPro, Woodman received nearly $80 million in total

19   compensation, including salary, bonus, option awards and all other compensation.  As of April

20   26, 2017, Defendant Woodman beneficially owned 36,576,628 shares of GoPro Class B common

21   stock, representing 76.81% of the total voting power with respect to all shares of GoPro's Class

22   A common stock and Class B common stock, as a single class.  Woodman signed all relevant

23   SEC filings on behalf of GoPro.  Woodman is a defendant in the 2016 Securities Action as well

24   as in the 2018 Securities Actions.

25          26.    Defendant McGee has served as the Company's CFO since March 2016.  For

26   fiscal year 2016, in exchange for his purported trust, loyalty, and fidelity to GoPro, McGee

27   received $1,338,320 in total compensation, including salary, bonus, option awards and all other

28   compensation.  As of April 26, 2017, Defendant McGee beneficially owned 39,901 shares of

GoPro Class A common stock.  McGee signed all relevant SEC filings on behalf of GoPro. McGee is a defendant in the 2016 Securities Action as well as in the 2018 Securities Actions.

27.     Defendant Bates served as the Company's President from June 2014 to December 2016 and as a member of the Board since June 2014.  For fiscal years 2014 to 2016, in exchange for his purported trust, loyalty, and fidelity to GoPro, McGee received nearly $43 million in total compensation, including salary, bonus, option awards and all other compensation.  As of April 26, 2017, Defendant Bates owned 487,596 shares of GoPro Class A common stock and 2,229,666 shares of Class B common stock, representing 4.58% of the total voting power with respect to all shares of GoPro's Class A common stock and Class B common stock, as a single class.  Bates is a defendant in the 2016 Securities Action.

28.     Defendant Edward Gilhuly ("Gilhuly") served on GoPro's Board from March 2011 to June 2017, and is the founder and managing partner of Sageview Capital, a private investment firm since May 2006.  During his time on GoPro's Board, Gilhuly served as a member of the Compensation and Leadership Committee as well as the Audit Committee.

29.     Defendant Kenneth Goldman ("Goldman") has served on GoPro's Board since December 2013 and as lead independent director since April 2017.  Goldman served as the CFO of Yahoo! from October 2012 until June 2017, where he was responsible for Yahoo's global finance functions including financial planning and analysis, controllership, tax, treasury, and investor relations.  Goldman has served as the Chair of GoPro's Audit Committee at all relevant times and is also a member of the Nominating and Governance Committee.

30.     Defendant Peter Gotcher ("Gotcher") has served on GoPro's Board since June 2014.  He is an independent private investor focusing on investments in digital media technology companies.  Gotcher serves as the Chair of the Compensation and Leadership Committee and is a member of the Audit Committee.  Upon information and belief, Gotcher is a citizen of the State of California.

31.     Defendant Alexander Lurie ("Lurie") has served on GoPro's Board since February 2016.  From November 2014, Lurie was GoPro's Senior Vice President of Media, until he left in January 2016 to be the CEO of SurveyMonkey, Inc.

32.     Defendant Michael Marks ("Marks") served on the Board from February 2011 until June 2017, and served as the Chair of the Compensation and Leadership Committee during that time.  He has been a Founding Partner of Riverwood Capital, a private equity firm, since March 2007.

33.     Defendant Lauren Zalaznick ("Zalaznick") has served on our board of directors since July 2016.  In addition to her work on various boards of directors, Zalaznick is currently a senior advisor to various content and tech start-ups including LifePosts and Medium.com. Zalaznick serves as the Chair of the Nominating and Governance Committee and is a member of the Audit Committee and Compensation and Leadership Committee.

34.     Defendant Susan Lyne ("Lyne") became a member of the Board in April 2017 and is a current member of the Compensation and Leadership Committee and the Nominating and Governance Committee.

35.     Rick Welts ("Welts") became a member of the Board in October 2017.

36.     The defendants identified in ¶¶25-27 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶25, 27-35 are referred to herein as the "Director Defendants."   The defendants in ¶¶28-30 are referred to herein as the "Audit Committee Defendants."   Collectively, the defendants identified in ¶¶25-35 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

37.     By reason of their positions as directors and/or officers, of GoPro and because of their ability to control its business and corporate affairs, the Individual Defendants owed GoPro and its stockholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage GoPro in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of GoPro and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.

38.     Each director and officer of the Company owes to GoPro and its stockholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of

- 8 -

1    the Company and in the use and preservation of its property and assets, and to uphold the highest

2    obligations of fair dealing.   In addition, the Individual Defendants had a duty to promptly

3    disseminate accurate and truthful information with regard to the availability and performance of

4    the Company's Karma drones, including in the Company's SEC filings.

5        39.    The Individual Defendants, because of their positions of control and authority as

6    directors and/or officers of GoPro, were able to, and did, directly and/or indirectly, exercise

7    control over the wrongful acts complained of herein, as well as the contents of the various public

8    statements issued by the Company.   Because of their advisory, executive, managerial, and/or

9    directorial positions with GoPro, each of the Individual Defendants had access to adverse,

10   nonpublic information about the financial condition, operations, and improper representations of

11   GoPro.

12       40.    At all times relevant hereto, each of the Individual Defendants was the agent of

13   each of the other defendants and of GoPro, and was at all times acting within the course and

14   scope of such agency.

15       41.    To discharge their duties, the officers and directors of GoPro were required to

16   exercise reasonable and prudent supervision over the management, policies, practices, and

17   controls of the financial affairs of the Company.   By virtue of such duties, the officers and

18   directors of GoPro were required to, among other things:

19       (a)    refrain from acting upon material, inside corporate information to benefit

20   themselves;

21       (b)    conduct the affairs of the Company in an efficient, business-like manner,

22   so as to make it possible to provide the highest quality performance of its business, to avoid

23   wasting the Company's assets, and to maximize the Company's value;

24       (c)    properly and accurately guide stockholders and analysts as to the true

25   financial condition of the Company at any given time, including making accurate statements

26   about the Company's financial results and prospects, and ensuring that the Company maintained

27   an adequate system of financial controls such that the Company's accounting and financial

28   reporting would be true and accurate at all times;

(d)     ensure that the Company's revenue projections were based on appropriate support and documentation, and were routinely checked for accuracy;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations;

(f)     ensure that there were sufficient checks and balances in GoPro's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of income, revenues, and cash flow; and

(g)     ensure that no inaccurate financial information about GoPro was released to the public that would tend to artificially inflate GoPro's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

42.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of GoPro, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders.  The Individual Defendants were aware, or recklessly disregarded, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants who collectively comprised GoPro's Board.

43.     Because of their positions with the Company, and their access to material nonpublic information available to them but not to the public, GoPro, through the Individual Defendants, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading.  As a result of the Individual Defendants' illegal actions and course of conduct, the Company, among other things, now is subject to multiple stockholder, consumer, and derivative lawsuits that allege violations of both federal and state law.  As a result, GoPro has expended, and will continue to expend, significant sums of money to defend against these lawsuits.

**SPECIFIC CORPORATE GOVERNANCE RESPONSIBILITIES
OF THE INDIVIDUAL DEFENDANTS**

44.    GoPro holds itself to specific corporate governance principles beyond the requirements of law.  For example, in its Corporate Governance Guidelines as revised on August 4, 2015, GoPro described the duties undertaken by the Board, and the active oversight role the Board played in its business affairs:

> The role of the Board is to oversee the performance of the chief executive officer ("CEO") and other senior management and to assure that the best interests of stockholders are being served.  To satisfy this responsibility, the directors are expected to take a proactive approach to their duties and function as active monitors of corporate management.  Accordingly, the directors provide oversight in the formulation of the long term strategic, financial and organizational goals of the Company and of the plans designed to achieve those goals.  In addition, the Board reviews and approves standards and policies to ensure that the Company is committed to achieving its objectives through the maintenance of the highest standards of responsible conduct and ethics and to assure that management carries out their day-to-day operational duties in a competent and ethical manner.

> The day-to-day business of the Company is carried out by its employees, managers and officers, under the direction of the CEO and the oversight of the Board, to enhance the long term value of the Company for the benefit of stockholders.  The Board and management also recognize that creating long term enterprise value is advanced by considering the interests and concerns of other stakeholders, including the Company's employees, customers, creditors and suppliers as well as the community generally.

> The Board understands that effective directors act on an informed basis after thorough inquiry and careful review, appropriate in scope to the magnitude of the matter being considered.  The directors know their position requires them to ask probing questions of management and outside advisors.  The directors also rely on the advice, reports and opinions of management, counsel and expert advisers.  In doing so, the Board evaluates the qualifications of those it relies upon for information and advice and also looks to the processes used by managers and advisors in reaching their recommendations.   In addition, the Board has the authority to hire outside advisors at the Company's expense if they feel it is appropriate.

45.    With respect to corporate books, financial accounting, and public disclosure, the Code of Business Conduct and Ethics (the "Code") directed to GoPro's employees, executives, and members of the Board, specifically requires:

**INTERNAL CONTROLS AND FINANCIAL RECORDS**

**Be diligent. Be accurate. Be compliant.**

Maintaining internal controls and ensuring complete, accurate and timely books, records and disclosures is more than a legal requirement at GoPro—it's essential to our success.   Our customers, partners, suppliers and investors rely on the information we provide to decide whether to purchase our products, partner with us or invest in our shared future.

As a GoPro employee, you're required to follow the internal controls that apply to your job or function.   As a GoPro manager or executive, you're responsible for ensuring that an adequately operating system of internal controls related to your function is in place, is effective, and addresses the company's business needs and compliance requirements.

**Maintaining complete, accurate, and timely records.**

At GoPro, we require that you accurately record sales, revenues, expenses, operational data, decision metrics and other essential company information.   This includes:

   • Providing complete, accurate and transparent information in all reports, records and expense claims.

   • Providing accurate, transparent and complete backup for all expenses.

   • Never deliberately making a false, artificial or misleading entry in a report, record or expense claim.

   • Always disclosing to your immediate manager or executive any information that may impact our financial records, our relationship with partners or the company's reputation.

   • Never establishing or maintaining an undisclosed or unrecorded side agreement, account, fund or asset.

46.     The Code also warns against buying and selling the Company's stock based on insider information, as follows:

**TRADING AND INSIDER INFORMATION**

**Keep inside information inside.**

Starting on your first day at GoPro, you may be entrusted with non-public information about our company or a partner company before the information is made public.   This is known throughout the industry as "inside information."

To protect investors and other stakeholders, securities laws (both in the United States and elsewhere) make it illegal for anyone with inside information to buy or

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

sell stocks or other securities.  It's also illegal to share inside information with anyone else who might use this information to trade.  Please read our Insider Trading Policy as soon as you start working at GoPro.

Obeying a few basic rules will ensure you are in compliance with the rules and regulations in the Code.  If you have a question about how securities trading or inside information applies to you, just ask.

\* \* \*

Do not buy or sell shares in GoPro, either directly or indirectly, if you're aware of inside information about the company.

47.     The Code, which is available on GoPro's website, contains provisions requiring any employee to report violations of the Code to a person in a position of higher authority.  This is a very simple process and can even be done anonymously.  To report on a violation, an employee can:

If you're uncertain about the validity of any entry, data, record or report (or if you are asked to create any false or misleading entry, data, record or report), immediately report it to the GoPro Legal Department and Internal Controls management.

GoPro has set up a Whistle Blower Hotline (1-877-214-7816) for the confidential and anonymous reporting of any suspected financial irregularities or related concerns. You can also contact the hotline via email at gpro@openboard.info or access it online at openboard.info/gpro.

48.     Correspondingly, the Charter of GoPro's Audit Committee specifies that the committee's purpose is to "to assist the Board in its oversight of: (a) the integrity of accounting and financial reporting processes of the Company … and (e) compliance by the Company with legal and regulatory requirements."

49.     In addition, the Charter imposes the following duties on the Audit Committee, in a section labeled "Responsibilities":

The principal responsibilities and duties of the Committee in serving the purposes outlined in Part I of this Charter are set forth below.  These duties are set forth as a guide with the understanding that the Committee will carry them out in a manner that is appropriate given the Company's needs and circumstances.  The Committee may supplement them as appropriate and may establish policies and procedures from time to time that it deems necessary or advisable in fulfilling its responsibilities.

- 13 -

The Committee will:

### *Financial Statements and Disclosures*

1.  Review and discuss with management the Company's quarterly results and the related earnings press release prior to distribution to the public.  Periodically discuss on a general basis with management the type of information to be disclosed and type of presentation to be made regarding released financial information.

2.  Review the Company's quarterly and annual financial statements.

3.  In connection with the Committee's review of the annual financial statements:

> a. discuss the financial statements and the results of the Independent Auditors' audit of the financial statements with the Independent Auditors, the internal audit department, and management;

> b. discuss any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "*PCAOB*").  These discussions should include an overview of the audit strategy, the Independent Auditors' judgments about the quality and appropriateness of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in the Company's financial statements, the representations the Independent Auditors are requesting from the Company's management and any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information; and

> c. discuss with the Company's management and the Independent Auditors the Company's selection, application and disclosure of critical accounting policies and practices; and

> d. review the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

4.  Recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K.

5.  In connection with the Committee's review of the quarterly financial statements:

> a. discuss with the Independent Auditors and the Company's management the results of the Independent Auditors' SAS No. 100, *Interim Financial Information* (Codification of Statements on Auditing Standards, AU § 722), or similar, review of the quarterly financial statements;

- 14 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

b.  discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies, judgments or estimates with the Company's management and the Independent Auditors; and

c.  review the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

6.   Resolve any disagreements between the Company's management and the Independent Auditors regarding financial reporting.

### ***Internal Controls***

7.   Review and discuss with the Independent Auditors and the Company's management their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including any significant deficiencies and material weaknesses in their design or operation.

8.  Review any allegations of fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee.

9.   Discuss any comments or recommendations of the Independent Auditors outlined in their annual management letter or internal control reports.  If appropriate, approve a schedule for implementing any recommended changes and monitor compliance with the schedule.

10.  Periodically consult with the Independent Auditors about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or the Independent Auditors believe should be discussed privately with the Committee.

11.  Meet separately, periodically, with management and with internal auditors (or other personnel responsible for the internal audit function)

12.  Review with management the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's procedures and any related policies, with respect to risk assessment and risk management.

13.  Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

* * *

### *Compliance*

21.   Review the effectiveness of the Company's systems for monitoring compliance with laws and regulations and the results of management's investigation and follow-up (including disciplinary action) of any instances of material or significant noncompliance.

22.  Review the findings of any examinations by regulatory agencies, and any auditor observations.

23.  Consider waivers of the Code of Business Conduct and Ethics (other than transactions that are subject to review by the Board as a whole or any other committee of the Board), including waivers requested for executive officers and directors (other than where the potential waiver involves a member of the Committee, in which event, such waiver shall be subject to the review of the Board), and retain authority to grant any such waivers.

### *General*

24.  On a regular basis, review the status of any legal matters that could have a significant impact on the Company's financial statements.

25.  Annually prepare a report to the Company's stockholders for inclusion in the Company's annual proxy statement as required by the Commission Rules.

26.  Regularly report to the board of directors about committee activities, issues, and related recommendations.

27.  The Committee will evaluate the Committee's composition and performance on an annual basis and submit a report to the Board.  The Committee also will review and reassess the adequacy of this Charter periodically, and recommend to the Board any changes the Committee determines are appropriate.

28.  Take such other actions and perform and carry out any other responsibilities and duties delegated to it by the Board or as the Committee deems necessary or appropriate consistent with its purpose.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breach of their respective duties.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

51.     The Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did conceal that GoPro's stock was materially and systematically overstated during the relevant period.

52.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, including breaches of fiduciary duty; and to conceal adverse information concerning the Company's future sales and continued growth.

53.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or recklessly releasing improper statements on the Company's behalf.  Because the actions described herein occurred under the Board's authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**FACTUAL BACKGROUND**

55.     GoPro is a publicly-traded company incorporated in Delaware.  GoPro's international headquarters is located in San Mateo, California.

56.     Defendant Woodman founded the Company in 2004 in order to make wearable cameras and accessories.  GoPro's first product was the HERO Camera.  GoPro's core product line continues to be the HERO line of cameras—now marketing the HERO6.  Over the past two years, GoPro has also added the Karma drone to its line of products.

57.     GoPro primarily sells its products over its website, and also through retailers such as Best Buy.  Approximately half of the Company's revenue comes from domestic sales, and the other half from international sales.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

58.     GoPro has a "real-time" supply chain monitoring system, based on enterprise resource planning ("ERP"), which is a process by which a company manages and integrates the important parts of its business.  ERP integrates areas such as planning, purchasing, inventory, sales, marketing, finance, and human resources.

59.     All ERP systems have a shared database used by different business units, so that employees in different divisions can rely on the same information for their specific needs. Among other things, an ERP solution provides a global, real-time view of data that can enable companies to address concerns proactively and drive improvement.

60.     In or around December 2009, GoPro chose NetSuite to be its ERP service provider, which is a cloud-based software that allows a company to integrate its ERP and other capabilities.  Among other things, NetSuite's ERP provides users with the ability to manage "end-to-end inventory and inbound/outbound logistics in real-time"  throughout its supply chain and distribution channel—or as GoPro's head of corporate development put it, GoPro "know[s] exactly how much product is at the distributors, and is sitting at our direct customers."

61.     NetSuite's ERP also has a "Report" function that allows users to view reports such as "Forecast vs. Quota," "Current Inventory Status," "Inventory Turnover," "Inventory Revenue," and "Inventory Status Report."  At any time, any of the Individual Defendants could have generated an inventory status report prior to making their false and/or misleading statements, and they would have recognized that the inventory GoPro had on hand and was available through its supply chain rendered it impossible to meet its guidance and customer demand.

62.     In addition to monitoring its supply chain, GoPro also engages with its customers to improve its products.  One of the ways GoPro monitors the usage of its products is through user-provided videos, such as the kind shown on YouTube.  In fact, GoPro "scours" the internet, including YouTube, for videos captured via the Company's devices.

63.     Additionally, GoPro's website serves as a hub for its "community" of users.  On its support hub, GoPro's customers can post questions, as well as share and find solutions regarding their GoPro devices.

1    64.    On July 12, 2015, the HERO4 Session, GoPro's new camera and key new product

2    offering for 2015, went on sale.   At that time, GoPro discovered that it had produced more

3    cameras than the market wanted.   This resulted in a $21 million impact to revenue from price

4    reductions on the HERO4 Session, $40 million from price protection charges for the camera in

5    the fourth quarter of 2015, and a $57 million write down of excess purchase order commitments,

6    excess inventory, and obsolete tooling.

7    65.    Due to overproduction, GoPro's retail channel was so full of its HERO4 line of

8    cameras that GoPro spent the first three quarters of 2016 waiting for retailers to sell-through

9    what they had already bought from GoPro.   Investors in the Company eagerly awaited GoPro's

10   next big product as they waited for the reductions in HERO4 inventory.

11                          **IMPROPER STATEMENTS**

12   66.    GoPro's past supply chain issues with its HERO4 cameras (HERO5's predecessor)

13   made the Individual Defendants keenly aware of the importance of inventory issues.

14   Specifically, because GoPro had overestimated the demand for its prior camera model, the

15   HERO4, when it first launched, GoPro was stuck with an oversupply of HERO4 cameras that it

16   needed retailers to clear before they could sell HERO5 cameras.   With this history in mind,

17   GoPro tracked product sell-through, the ratio of inventory on hand to products sold to

18   consumers, on a weekly basis.

19   67.    In 2016, the Company had set its eyes on the consumer drone market.   This was a

20   large and untapped market for GoPro.   In addition, the Company also prepared to launch its all-

21   new line of HERO5 cameras by the holiday season.

22   68.    GoPro planned to enter the drone market with the launch of the Karma, initially

23   telling investors that Karma would hit "store shelves in the first half of 2016."   During GoPro's

24   February 3, 2016 conference call with analysts and investors.   Defendant Bates—who was the

25   Company's president at that time—noted that the Company created a registration page on its

26   website in November 2015 "where more than 100,000 consumers have already registered to

27   receive updates about Karma."   That same day, GoPro issued its 2016 full-year revenue

28

1   guidance, stating that GoPro expected revenue of approximately $1.35 billion to $1.5 billion,

2   based in large part on the success of the Karma drone and HERO5 cameras.

3         69.    On May 5, 2016, however, defendant Woodman told investors that the Karma

4   drone's launch would be delayed until that year's holiday season of 2016, assuring investors that

5   "Karma includes revolutionary features that differentiate[d] [it] from other drones."  ████████

6   █████████████████████████████████████████████████████████████████████████████████

7   █████████████████████████████████████████████████████████████████████████████████

8   █████████████████████████████████████████████████████████████████████████████████

9   █████████████████████████████████████████████████████████████████████████████████

10  ██████████████████████████████  GoPro nonetheless publicly maintained its revenue

11  guidance.

12        70.    On July 27, 2016, GoPro announced its second quarter 2016 results, again

13  maintaining its revenue guidance of $1.35 billion to $1.5 billion.  That same day, GoPro held a

14  conference call with analysts and investors.  During that call, defendant McGee answered an

15  analyst's question regarding GoPro's channel inventory stating, "I think we've done a great job in

16  channel inventory….  The existing products continue to sell out in the summer months, and then

17  be ready for a heck of a launch in the second half."[4]

18        71.    With respect to GoPro's upcoming Karma drone and HERO5 line of cameras

19  launch, defendant Woodman responded to an analyst's question regarding retail space and

20  GoPro's launch strategy, stating:

21      …[W]hat I can say is that we have shared Karma with some of our key retailers,
22      and we've shared our other new products with some of our key retailers, and the
    reception has been fantastic....  And another point to note on is that this year we're
23      doing a much better job of communicating with our retailers globally to prepare
    together, as a team, for new product launches and to maximize the marketing

24  _____

25  [2] ███████████████████.

26  [3] ██

27  [4] ████████████████████████████████████████████████████████.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

opportunities around those launches. And that's something that we've never really done a terrific job of before because, strategically, we held our new products much more closer to the vest and kept it secret from our retailers up until just before launch. And we realized last year that we needed to be a much better partner with our retailers and get ahead of it earlier so that we could plan big launches with them. And that's something that I'm very proud of that we've changed our approach to channel marketing, and we expect it to bear fruit the second half.

72.    Defendant Bates also assured investors that GoPro was "closely tracking [inventory], making sure that [it] can ramp into [its] second half plans" and that GoPro "fe[lt] really good about [its] inventory right now."

73.    On September 19, 2016, GoPro unveiled its highly anticipated new products—the HERO5 Session, the HERO5 Black, and the Karma drone. GoPro's press release that announced the unveiling of these products listed their respective prices and the dates on which they would become available for sale. The HERO5 Session and HERO5 Black cameras were priced at $299.99 and $399.99, respectively, and were listed as being available on October 2, 2016. The Karma drone was priced at $799.99 without a GoPro camera, $999.99 when bundled with the HERO5 Session, and $1099.99 when bundled with the HERO5 Black. The Karma drone was listed as being available on October 23, 2016. These products were expected to produce "the vast majority of [GoPro's] full-year revenue occurring in the second half of the year."

74.    On September 19, 2016, GoPro held a conference call with analysts and investors to discuss the new product launch. During the call, defendant Woodman had stated that HERO5 cameras would be "distributed through all GoPro retailers globally," while the Karma drone would be "distributed through select retailers around the world." Defendant McGee also continued to affirm that GoPro was "on track" to meet its revenue guidance of $1.35 billion to $1.5 billion.

75.    Wedbush Securities published an analyst report in which it estimated that revenue attributable to the Karma drone for the fiscal year 2016 (meaning drones sold between October 23 and December 31, 2016) would be $96 million, reflecting an estimate of 150,000 units sold during that two month period at a wholesale price of $640 per unit.

76.     In fact, GoPro was not "on track" to meet its revenue guidance at that time. Defendant McGee failed to mention that, at most, the Company had only 2,500 Karma drones in supply, or approximately $2 million worth of drones.  A number far below the 50,000-150,000 units GoPro executives had led the market to believe it would sell.  This known deficit meant that there was no way GoPro would meet its $1.35 billion to $1.5 billion guidance.

77.     GoPro's management had access to these facts in real-time through the Company's use of NetSuite, which would have alerted GoPro and its management to the production ramp-up issues.

78.     Despite access to this real-time data, on October 3, 2016, in an interview with Bloomberg West, defendant Woodman affirmed that GoPro was ready to make the Karma drone "available on October 23rd."

79.     ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████ ████████████
████████████████████████████████████████████
██████████████████.[6]

80.     On October 23, 2016, the day that the Karma drone was supposed to officially launch, several consumers posted to GoPro's Facebook page, complaining of the drone's unavailability.  One customer complained, "Wow after waiting since the announcement we can't buy it on the release date?  Well we can but won't have it for a few more weeks looks like it's time to start looking at different drones."

81.     The Karma drone's unavailability and low supply spooked the market, affecting GoPro's stock price.  On this news, the price of GoPro's stock fell $1.05 per share, or about 7%

---

[5] ████████████████████████████████████████

[6] ██████████████████████.

1    from the previous Friday's closing price of $14.93 per share, closing at $13.88 per share on

2    Monday, October 24, 2016, a market cap drop of over $146 million.

3         82.    The few customers who managed to secure one of GoPro's 2,500 Karma drones

4    soon began reporting problems with their drones that caused the drones to drop out of the air

5    mid-flight.  On October 28, 2016, five days after the Karma drone's product launch, YouTube

6    user Brian Warholak uploaded a video of his Karma drone crashing just two minutes into its

7    flight, and contacted GoPro regarding this issue.  Other users posted directly on GoPro's support

8    hub regarding the Karma drone's defects.

9         83.    In fact, "inherent in [the Karma drone's] design [was a defect]" that dangerously

10   reduced even its supposed eighteen minute modest flight time.  The drone's battery latch had a

11   design flaw such that the "batteries disconnected during flight resulting in a loss of power."  This

12   caused the drone's battery, as defendant Woodman had put it, to "pop out [on] occasions."  The

13   only solution for this defect was to recall the drones and "redesign[] [the] latch."

14        84.    The Individual Defendants would have been made aware of the obvious battery

15   defect had it adequately tested the Karma drone. ████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████████████████

24   ██████████████.[7]

25

26   _____

27   [7] ███████████████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████.

85.     The Karma drone was not the only product in which GoPro was having troubles. It had significant production issues with its HERO5 cameras, caused by its waterproof design. Again, GoPro's management had access to these facts in real-time, because of their reliance on NetSuite, which would have alerted GoPro and its management to the production ramp-up issues.

86.     Despite the shortage of HERO5 cameras, on September 19, 2016, defendant McGee stated that GoPro was "on track" to meet its revenue guidance of $1.35 billion to $1.5 billion.   On October 3, 2016, defendant Woodman affirmed that GoPro would perform to expectations in the third and fourth quarters, stating that GoPro's HERO5 camera sales were going to result in a "very nice post-holiday up-tick" for GoPro fans and investors. ███████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████.[8]

87.     Just three weeks after the HERO5 cameras' October 2nd launch, *TheStreet* reported that availability checks of HERO5 camera products indicated that supply was low, and that retailers received few restocks of the cameras since receiving initial shipments on October 2nd.

88.     ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████.[9]

89.     ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

———————————————

[8] ███████████████████████████████████████████████████████████

[9] █████████████████.

- 24 -

1 ███████████████████████████████████████████████████

2 ██████████████████████████████████.[10]

90.     After the market closed on November 3, 2016, GoPro's investors were stunned when the Company issued a press release announcing its third quarter revenues, with lowered 2016 full year guidance to $1.25 billion to $1.3 billion and its fourth quarter revenue guidance to $625 million (+/- $25 million).   The press release stated that this revision was attributed to "production ramp-up" issues which resulted in a shortage of HERO5 cameras and Karma drones. Defendant McGee attributed the "bulk of the" revenue hit to the HERO5 cameras, not the Karma drone.  He also explained that GoPro's fourth quarter revenues assumed that the Karma drone would account for slightly less than 10%—or $60 million—of the Company's revenues. Investors were, of course, unaware that even this lowered guidance was not feasible.  GoPro only had a supply of just 2,500 Karma drones, or around $2 million in drone sales, and most of those 2,500 were defective.

91.     Defendant McGee also confirmed to investors that the Karma drone would represent slightly "less than 10%" of GoPro's fourth quarter revenue.  Defendant McGee failed, however, to mention the Karma drone's crashing incidents.

92.     After being informed of the new $625 million fourth quarter revenue guidance, and that Karma drone sales would account for less than 10% of that revenue, analysts estimated that the Karma drone would need to account for just under $60 million in revenue that quarter.

93.     In order to raise the much revenue, GoPro would need to sell around 50,000-75,000 units (at the price of $1099.99, 50,000 drones would net around $54 million).

94.     Investors were unaware that the 10% revenue for GoPro's fourth quarter could not possibly be attained from 2,500 drones which GoPro had on hand (at the price of $1099.99, 2,500 drones would net around $2.75 million).  ████████████████████████████████,

_____

[10] ██████████████████████████████████████████████████

████████████████████████████ ████████████████████████████

██████████████████████

1 ███████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 ███████████████████████████████████████████████

4 ███████████████████████████████████████████████

5 ████████████████

6      95.      On this news, the price of GoPro's stock fell $0.78 per share, or over 6.5% from

7 the previous day's closing price of $11.94 per share, to close at $11.16 per share on November 4,

8 2016, a market capitalization drop of over $109 million.

9      96.      On November 4, 2016, GoPro also filed with the SEC its Quarterly Report on

10 Form 10-Q for the third quarter of 2016 which updated its risk factors to include new language

11 italicized below:

12      **To remain competitive and stimulate consumer demand, we must manage frequent product introductions and transitions.**

13

14                                    *   *   *

15   The success of new product introductions depends on a number of factors including, but not limited to, timely and successful research and development, pricing, market and consumer acceptance, the effective forecasting and management of product demand, purchase commitments and inventory levels, ***the availability of products in appropriate quantities to meet anticipated demand***, the management of manufacturing and supply costs, ***the management of risks associated with new product production ramp-up issues***, and the risk that new products may have quality or other defects in the early stages of introduction. In addition, the introduction or announcement of new products or product enhancements may shorten the life cycle of our existing products or reduce demand for our current products, thereby offsetting any benefits of successful product introductions and potentially lead to challenges in managing inventory of existing products. Failure to complete product transitions effectively or in a timely manner could harm our brand and lead to, among other things, lower revenue and excess inventory, ***or a deficit of inventory***.

24      97.      ████████████████████████████████████████████

25 ██████████████████████████████████████[11]

26   _____

27 [11] ████████████████████████████████████████████

28 ██████████████████████████.

98.     After the market closed that same day, GoPro recalled its Karma drones, disclosing for the first time that it had only produced and sold 2,500 drones, or about $2 million worth.  This was a far cry from the $60 million required to meet its lowered revenue guidance, let alone the 50,000-150,000 units of Karma drones the market had been led to expect previously.  This recall also stood in stark contrast to GoPro's Form 10-Q filed only four days before affirming that the Karma drone was "now available at major U.S. retailers."  Although GoPro's reduced revenue guidance was "no longer[] feasible," nobody corrected or updated the guidance that was issued five days earlier.  On news of the recall and confirmation of the paltry supply of 2,500 Karma drones produced by GoPro, the next day, the price of GoPro's stock fell $0.45 per share, or over 4% from the previous day's closing price of $10.86 per share, to close at $10.41 per share, a fall in market capitalization of $63 million.[12]

99.     After the recall, GoPro did not update its revenue guidance.  During a conference call with analysts and investors on November 30, 2016, defendant McGee was asked about the impact of the Karma drone on GoPro's numbers, to which he responded: "there wasn't quite frankly that many [Karma drones] that were out in the market."

100.     It was not until February 2, 2017, when GoPro revealed its fourth quarter and 2016 revenue, that investors were informed of the true impact of the Karma drone's supply deficit on GoPro's revenue.  GoPro recorded $540.6 million in revenue for the fourth quarter of 2016 instead of the minimum $600 million it had guided for the quarter, and experienced a GAAP (generally accepted accounting principles) loss of approximately $116 million for that period.

101.     During an earnings call that day, defendant Woodman revealed that the Karma drone was GoPro's "biggest challenge to [its] quarterly revenue."  The Company also missed its

---

[12] At the end November 2016, it was announced that defendant Bates would be resigning as GoPro's President effective on December 31, 2016 (although he would remain a member of the Company's Board), and that defendant Bates and the Company had entered into a severance agreement whereby he would receive $2.4 million in cash as well as an immediate vesting of 25% of his shares, which were initially subject to equity grants.

full year 2016 guidance, recording $1.18 billion in revenue instead of the minimum $1.25 billion it had guided for the year.  As a result of this news, the price of GoPro's stock fell $1.39 per share, or over 12% from the previous day's closing price of $10.97 per share, to close at $9.58 per share on February 3, 2017, a drop in market capitalization of over $195 million.

102.    This revelation came only weeks after defendant Woodman's interview with *TechCrunch* during which returning to profitability, banking on sales of its new HERO5 cameras, and that not only would GoPro continue selling a relaunched Karma drone, but even planned to develop new drones.

103.    GoPro's 2017 Proxy Statement filed on Form DEF 14A with the SEC on April 26, 1027 (the "Proxy"), sought stockholder votes for, among other things, director nominations to the Board and long-term executive compensation programs.  Part of the reason defendant Woodman was recommending positive votes from the Company's stockholders was based on the Company's revenue results and prospects for huge market-share gains.  In fact, the Proxy specifically noted that "GoPro's executive compensation programs, policies and practices ("**ECPs**") are designed to reflect the three major tenets of [its] executive compensation philosophy," the first of which is to "[a]lign executive compensation with achievement of [its] business objectives and financial performance."  The primary executive compensation elements are a base salary, an annual cash bonus, and long-term incentives/equity awards.

104.    In asking GoPro stockholders to elect the Board nominees and approve the Company's compensation plan, however, the Proxy failed to include any references concerning growing demand problems with the Karma drone and HERO5 line of cameras and decreasing likelihood that the Company could meet its revenue guidance.  The Individual Defendants negligently failed to include this information in the Proxy making it materially misleading and violated section 14(a) of the Exchange Act and SEC Rule14a-9 promulgated thereunder.  The misleading Proxy was the necessary and essential link to stockholder approval of the compensation and reelection of the directors.

105.    The next day, when announcing its first quarter results, defendant Woodman said "GoPro is executing a turnaround," and touted that the Karma drone relaunch was off to a strong start.  The Company's revenue guidance for the second quarter was $270 million +/- $10 million.

106.    In May 2017, following the Company's issuance of its 2016 Annual Report, the SEC directed the Company to make more fulsome disclosures about "known trends or uncertainties" impacting its business as required by SEC Rule SK-303, with GoPro pledging to do so, stating:

[SEC]: 1. *We note that there have been significant increases in your research and development expenses in recent periods, and that you expect this trend to continue in 2017. Please revise your MD&A to disclose any known trends or uncertainties with respect to your research and development expenses, and discuss if known the anticipated drivers therefor. For example, it appears that certain of your R&D expenditures have related to the resolution of issues related to Karma*.

[GoPro]: We respectfully advise the Staff that we considered known trends and uncertainties with respect to our operating expenses (including research and development expenses) in preparing MD&A disclosures in the Form 10-K and believe we have adequately addressed such trends and uncertainties. By way of background, the Form 10-K includes the following disclosure pertaining to known trends and uncertainties, and the anticipated *drivers* therefor, regarding our anticipated operating expenses as well as the focus of our research and development spending.

\* \* \*

*We advise the Staff that we intend to continue to review and consider our disclosures regarding known trends and uncertainties in future filings, and include appropriate discussion in MD&A accordingly*.

107.    On August 3, 2017, the Company issued a press release announcing the second quarter 2017 financial results, reporting revenue of "$297 million, up 34% year-over-year and 36% quarter-over-quarter."   Defendant Woodman emphasizing that GoPro was "building momentum" and was continuing to experience "[s]trong demand."  The press release also noted:

- Second Quarter revenue was $297 million, up 34% year-over-year and 36% quarter-over-quarter. Adjusted EBITDA was $5.1 million.
- Sharp focus on inventory and channel management resulted in a 39% reduction in inventory quarter-over-quarter; forward weeks of supply in the channel is down 25%. Both position us well for upcoming product launches.

- Global sell-thru of cameras increased 18% sequentially. Additionally, camera sell-thru above $300 was up 13% year-over-year, including 7% in EMEA and 194% in Japan. According to GfK, camera unit sales in Japan are up 164% and dollar sales are up 147% year-over-year in the second quarter.

- HERO5 Black was the best-selling digital image camera in the U.S. in the second quarter, according to The NPD Group's Retail Tracking Service.

108.    The press release also provided the following financial guidance:

- Third Quarter 2017
  - Revenue of $300 million +/- $10 million
  - GAAP and non-GAAP gross margin to be 37% +/- 1%
  - GAAP operating expenses of between $131 million and $133 million
  - Non-GAAP operating expenses of between $115 million and $117 million
  - GAAP EPS to be $(0.24) +/- $0.05
  - Non-GAAP EPS to be $(0.06) +/- $0.05

- 2017
  - GAAP operating expenses below $570 million
  - Non-GAAP operating expenses below $495 million

109.    Later that evening, during an earnings conference call with investors and analysts to discuss the quarterly results, defendants Woodman and McGee provided additional positive commentary about the Company's business metrics and financial prospects, stating:

[Defendant Woodman]:

Good afternoon. Our second quarter performance capped a strong first half of the year for GoPro, where brand **engagement**, **consumer demand, and sell-through of our products were better than expected.** Our second quarter was EBITDA-positive and our revenue grew year-over-year by 34% to $297 million. Inventory was down 39% in the second quarter, positioning us well for new product releases later this year.

For the third consecutive quarter, our premium-priced camera, HERO5 Black, was the best-selling camera in the United States, and GoPro's drone, Karma, is the nation's #2 selling drone brand.

Our second quarter gross margin was 36%, a sequential improvement, buoyed by the margin strength of HERO5 Black and HERO5 Session. We expect margins to continue to improve throughout 2017, with the introduction of new products. And we remain on track to reduce our annual operating expenses by 30% year-over-year to less than $495 million.

*To summarize, we're seeing strength across our business, thanks to strong demand and improved focus and execution.* We continue to track toward our goal of low double-digit revenue growth and full year non-GAAP profitability in 2017.

While it's encouraging to see improved momentum in our business, we're particularly excited about innovations in our road map that will enhance our relevance to consumers in this increasingly smartphone-centric world.

*    *    *

[Defendant McGee]:

*…Our strong revenue growth was principally driven by demand* from our HERO5 Black camera and sequential revenue growth from Karma. Camera units shipped was over 1 million in the second quarter, a sequential and year-over-year increase of 44% and 40%, respectively.

Our HERO5 Black camera with the retail price point of $399 accounted for over 60% of our camera units shipped in the quarter and over 70% of the total second quarter camera revenue.

110.    On August 3, 2017, defendants Woodman and McGee certified the Company's second quarter Form 10-Q filed with the SEC, which purported to fully disclose to investors any "known trends and uncertainties" affecting its business.

111.    According to the Form 10-Q, the Company expected fourth quarter 2017 sales to be larger than the second and third quarter sales, stating:

*Seasonality.* Historically, we have experienced the highest levels of revenue in the fourth quarter of the year, coinciding with the holiday shopping season, particularly in the United States and Europe.

112.    The Form 10-Q also asserted that "[s]easonal consumer shopping patterns significantly affect [its] business," and that it had "traditionally experienced greater revenues in the fourth quarter of each year due to demand related to the holiday season, and in some years, including 2016, the launch of new products heading into the holiday season," such that "[f]ourth quarter revenue comprised [a full] 46%, 27% and 45% of [its] 2016, 2015 and 2014 revenue, respectively."   GoPro stated that it "anticipate[d] that this seasonal impact [was] likely to continue."

113.     On September 7, 2017, the Company issued a press release announcing that it was experiencing "[s]trong [c]onsumer [d]emand for the [b]rand," and with channel inventories of dated product, i.e., HERO5 cameras, "reduced," the upcoming launch of HERO6 cameras and Fusion, the 5.2K spherical camera, was expected to be even more profitable, justifying an increase in GoPro's third quarter of 2017 financial guidance.  The release stated:

> **GoPro Expects Third-Quarter 2017 Revenue and Gross Margin Will Be at the High-End of Guidance:**
>
> Seeing Strong Consumer Demand for the Brand
>
> HERO6 and Fusion Cameras are Tracking for launch in 2017.
>
> GoPro, Inc., (NASDAQ: GPRO) today announced revenue and gross margin for the third quarter of 2017 are both expected to be at the high end of their previously announced respective ranges of between $290-$310 million and 36-38 percent. GoPro also forecasts the third quarter to be profitable on a non-GAAP basis, though not profitable on a GAAP basis.
>
> "Consumer demand for GoPro products is strong," said GoPro Chief Operating Officer CJ Prober. "Channel inventories have been reduced and we're incredibly excited about the upcoming launch of two great new products, HERO6 and our 5.2K spherical camera, Fusion."

114.     On November 1, 2017, GoPro issued a press release announcing its third quarter 2017 financial results and providing financial guidance for the fourth quarter and fiscal year 2017.  In addition to reporting that 2017's third quarter "[r]evenue was $330 million, up 37% year-over-year," the release announced that GoPro had reached profitability in that quarter, reporting that: (i) "***GAAP net income for the third quarter was approximately $15 million, or $0.10 per share*** – a sharp improvement over a GAAP net loss of $104 million in the third quarter of 2016."  The press release also highlighted that: (i) "***[a]verage sales price (ASP) increased by 22% year-over-year and 3% sequentially*** ... driven by the strong performance of the premium-priced HERO6"; (ii) "***HERO6 Black launched on September 28*** ... with strong sales execution and a 93% channel fill rate at retail"; (iii) "***[p]rior to the HERO6 launch, HERO5 Black was the best-selling digital image camera in the U.S. for four straight quarters*** – holding that chart position since its launch in 2016, according to The NPD Group's Retail Tracking Service"; and (iv) "***GoPro's drone, Karma, was the #2 selling drone*** in the U.S. ***priced $1,000 and above***

during the six months ending September 2017, according to the NPD Group's Retail Tracking Service." The release also quoted defendant Woodman, stating:

> "*GoPro has turned a corner, restoring growth and profitability to our business*…. We are dedicated to growing as an innovative company, while being a vigilant steward of shareholder capital."

> "During the quarter we generated $47 million in cash and gross margins were 40 percent. Year-over-year, we grew revenue by 37 percent and dramatically reduced operating costs without impacting our product roadmap. We launched our premium-priced HERO6 Black *with global on-shelf availability and strong critical acclaim. We are now focused on driving consumer demand to reach our goal of full-year double-digit revenue growth and non-GAAP profitability*."

115. The press release also provided the following financial guidance:

- Fourth Quarter 2017
  - ***Revenue of $470 million +/- $10 million***
  - GAAP and Non-GAAP gross margin to be 41.5% +/- 50 basis points
  - GAAP operating expenses of $149 million +/- $1 million
  - Non-GAAP operating expenses of $130 million +/- $1 million
  - GAAP EPS to be between $0.25 and $0.35
  - Non-GAAP EPS to be between $0.37 and $0.47

- Full Year 2017
  - ***Revenue of $1.315 billion +/- $10 million***
  - GAAP operating expenses below $570 million
  - Non-GAAP operating expenses below $490 million
  - GAAP EPS to be between $(0.65) and $(0.55)
  - Non-GAAP EPS to be between $(0.02) and $0.08

116. On November 3, 2017, GoPro filed its third quarter 2017 Form 10-Q with the SEC, in which it was purported to fully disclose to investors any "known trends and uncertainties" affecting its business. The Form 10-Q certified by defendants Woodman and McGee, it was represented that the Company expected its fourth quarter of 2017 to be higher than the second and third quarters of 2017. The reason was because:

> *Seasonality.* Historically, we have experienced the highest levels of revenue in the fourth quarter of the year, coinciding with the holiday shopping season, particularly in the United States and Europe.

117.   The Form 10-Q went on to assert that GoPro had "traditionally experienced greater revenues in the fourth quarter of each year due to demand related to the holiday season, and in some years, including 2016, the launch of new products heading into the holiday season," noting that "[f]ourth quarter revenue comprised 46%, 27% and 45% of [its] 2016, 2015 and 2014 revenue, respectively"—so always more than 25% of annual revenues and sometimes nearly 50%.   GoPro further stated that it "anticipate[d] that this seasonal impact [was] likely to continue."

### THE TRUTH IS REVEALED

118.   On January 8, 2018, GoPro announced its preliminary financial results for its fourth quarter of 2017—the quarter that included GoPro's all-important 2017 holiday selling season.   While defendants had forecasted sales of $470 million and analysts had been led to believe GoPro would report sales exceeding $472 million based on the Individual Defendants' bullish statements, GoPro actually reported sales of just $340 million.   These results were blamed on the slashing of prices for the Company's HERO line of cameras, as well as its Karma drone, during the quarter.   This was purportedly done, in part, because the Company had been forced to engage in moving inventory which had a negative $80 million impact on revenues.   The press release also disclosed the Company was cutting more than 20% of its workforce, exiting the drone market altogether, which required it to dump its remaining Karma drone inventory, and reducing the price of its new HERO6 cameras to $399 from $499.   The workforce reduction also would cost GoPro $33 million, mainly in severance costs.

119.   On this news, the price of GoPro's stock declined, falling from a close of $7.52 per share on January 5, 2018, to trade as low as $5.04 per share in intraday trading on January 8, 2018, before closing at $6.56 per share.   In total, GoPro's market capitalization fell over $140 million, or 12.7%.

### INSIDER TRADING ALLEGATIONS

120.   Rather than providing the market with the correct information, defendants Woodman, Gilhuly, Bates, Marks, and McGee, used their knowledge of GoPro's material nonpublic information to dispose of millions of dollars' worth of the beneficially held Company

stock at a time when its stock price was inflated by the improper statements.  In particular,

defendant Woodman disposed of over 2.6 million shares for proceeds of almost $11 million;

defendant Gilhuly sold 700,000 shares for proceeds of over $10.5 million; defendant Bates

disposed of almost 300,000 shares for proceeds of nearly $2.9 million; defendant Marks disposed

of over 120,000 shares for proceeds of over $900,000; and defendant McGee disposed of almost

28,000 shares for proceeds of over $265,000.  The following table shows the timing and amount

of each of these defendants' dispositions:

| Insider Last Name | Transaction Date | Transaction Code | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| **BATES** | 3/2/2016 | F | 5,790 | $13.02 | $75,385.80 |
| **Current Director (Former President)** | 3/4/2016 | S | 5,057 | $13.62 | $68,891.51 |
| | 3/4/2016 | S | 4,700 | $14.48 | $68,046.60 |
| | 6/2/2016 | F | 5,843 | $10.72 | $62,636.96 |
| | 6/6/2016 | S | 9,704 | $10.79 | $104,695.49 |
| | 8/15/2016 | F | 6,403 | $15.61 | $99,950.83 |
| | 9/2/2016 | F | 5,843 | $14.13 | $82,561.59 |
| | 9/7/2016 | S | 9,704 | $14.16 | $137,389.23 |
| | 11/15/2016 | F | 12,563 | $10.14 | $127,388.82 |
| | 12/2/2016 | F | 8,113 | $9.70 | $78,696.10 |
| | 12/6/2016 | S | 7,434 | $9.68 | $71,961.12 |
| | 12/7/2016 | S | 23,598 | $9.62 | $227,012.76 |
| | 1/3/2017 | F | 24,178 | $8.77 | $212,041.06 |
| | 1/3/2017 | F | 43,611 | $8.77 | $382,468.47 |
| | 3/6/2017 | S | 41,077 | $8.19 | $336,338.48 |
| | 6/6/2017 | S | 41,076 | $8.49 | $348,899.54 |
| | 9/7/2017 | S | 25,529 | $10.17 | $259,502.29 |
| | 12/6/2017 | S | 17,023 | $7.98 | $135,775.45 |
| | **Total Shares Disposed** | | **297,246** | **Total Proceeds** | **$2,879,642.09** |
| | | | | | |
| **GILHULY** | 8/17/2016 | S | 225,000 | $15.39 | $3,461,647.50 |
| **Former Director** | 8/18/2016 | S | 150,000 | $15.19 | $2,277,825.00 |
| | 8/19/2016 | S | 325,000 | $14.91 | $4,846,562.50 |
| | **Total Shares Disposed** | | **700,000** | **Total Proceeds** | **$10,586,035.00** |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| | | | | | |
|---|---|---|---|---|---|
| **MARKS** | 8/15/2016 | S | 40,000 | $15.58 | $623,132.00 |
| **Former Lead Independent Director** | 8/19/2016 | G | 50,000 | $0.00 | $0.00 |
| | 8/31/2016 | S | 247 | $14.94 | $3,690.18 |
| | 8/31/2016 | S | 17 | $14.94 | $253.98 |
| | 2/17/2017 | S | 30,000 | $9.22 | $276,510.00 |
| | **Total Shares Disposed** | | 120,264 | **Total Proceeds** | **$903,586.16** |
| | | | | | |
| **McGEE** | 10/17/2016 | F | 1,410 | $14.07 | $19,838.70 |
| **Current Chief Financial Officer** | 11/14/2016 | S | 4,497 | $10.32 | $46,409.04 |
| | 2/15/2017 | F | 4,308 | $9.44 | $40,667.52 |
| | 2/21/2017 | S | 5,692 | $9.31 | $52,992.52 |
| | 8/15/2017 | F | 3,132 | $9.88 | $30,944.16 |
| | 10/16/2017 | F | 1,410 | $9.08 | $12,802.80 |
| | 11/16/2017 | S | 7,541 | $8.23 | $62,069.22 |
| | **Total Shares Disposed** | | 27,990 | **Total Proceeds** | **$265,723.96** |
| | | | | | |
| **WOODMAN** | 2/5/2016 | G | 1,474,623 | $0.00 | $0.00 |
| **Current Chief Executive Officer, Director** | 2/25/2016 | G | 19,200 | $0.00 | $0.00 |
| | 9/6/2016 | F | 43,484 | $14.57 | $633,561.88 |
| | 10/3/2016 | F | 43,484 | $16.74 | $727,922.16 |
| | 11/3/2016 | F | 43,484 | $11.94 | $519,198.96 |
| | 12/5/2016 | F | 43,484 | $9.66 | $420,055.44 |
| | 1/3/2017 | F | 32,125 | $8.77 | $281,736.25 |
| | 2/3/2017 | F | 39,382 | $9.58 | $377,279.56 |
| | 3/3/2017 | F | 43,484 | $8.84 | $384,398.56 |
| | 4/3/2017 | F | 43,484 | $8.61 | $374,397.24 |
| | 5/3/2017 | F | 43,484 | $8.40 | $365,265.60 |
| | 6/5/2017 | F | 43,484 | $8.57 | $372,657.88 |
| | 8/25/2017 | G | 2,400 | $0.00 | $0.00 |
| | 11/3/2017 | S | 515,000 | $9.30 | $4,789,963.50 |
| | 11/6/2017 | S | 165,343 | $9.02 | $1,491,278.12 |
| | 11/7/2017 | S | 26,637 | $9.00 | $239,733.00 |
| | **Total Shares Disposed** | | 2,622,582 | **Total Proceeds** | **$10,977,448.15** |
| | | | | | |
| | **Total Shares Disposed** | | 3,768,082 | **Total Proceeds** | **$25,612,435.36** |

121.    Defendant Gilhuly's sales are particularly suspicious as it represents over 40% of his GoPro holdings.  Similarly, defendant Bates sold over 46% of his holdings.

## **DAMAGES TO GOPRO**

122.    All of these acts and omissions have caused significant injury to GoPro, for which the Individual Defendants should be held personally liable.  Aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the

Company to very expensive legal costs to defend, investigate, and pay judgment or settlements in multiple lawsuits, including:

123.   On November 16, 2016, the 2016 Securities Action was filed in the Northern District of California, alleging that the Company and certain officers and directors (collectively, the "2016 Securities Action Defendants") violated federal securities laws by issuing false and misleading statements to the investing public.  The 2016 Securities Action alleges that between September 19 and November 8, 2016, inclusive, the 2016 Securities Action Defendants engaged in a fraudulent scheme and course of conduct designed to hide the truth about the availability and quality of certain of the Company's products.

124.   On July 26, 2017, the Court presiding over the 2016 Securities Action issued an Order Denying Motion to Dismiss First Amended Complaint (the "2016 Securities Action Order"),[13] denying in large part the 2016 Securities Action Defendants' motion to dismiss, finding that the 2016 Securities Action plaintiff had successfully stated a claim for relief and, most importantly, overcome the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4 ("PSLRA").  More specifically, the 2016 Securities Action Court found that the lead plaintiff had adequately pleaded that the September 19, 2016 statements described above were false and misleading when made (and not covered by the PSLRA safe harbor provision for forward-looking statements),[14] that statements made in the Company's November 4, 2016 Form 10-Q about the availability of its Karma drone was also false and misleading,[15] and that statements made about the drone's flight time and video quality were false and misleading.[16]   Finally, the 2016 Securities Action Court found that the 2016

---

[13] *Larkin v. GoPro, Inc., et al.*, No. 4:16-cv-06654-CW, 2016 Securities Action Order (Dkt. No. 74) (N.D. Cal. July 26, 2017).

[14] 2016 Securities Action Order at 11-12.

[15] *Id.* at 13.

[16] *Id.* at 14.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1   Securities Action Complaint successfully overcame the PSLRA's high threshold for pleading

2   scienter on behalf of the 2016 Securities Action Defendants because:

3       Plaintiff alleges not only that [the 2016 Securities Action] Defendants had access
        to a NetSuite enterprise resource planning system with real-time reporting
4       capabilities, but also that [the 2016 Securities Action] Defendants were motivated
        to use that system due to prior inventory problems.   Moreover, GoPro's
5       executives, including Defendants Woodman and McGee, boasted that GoPro
        closely tracked its inventory and knew how much inventory was in the channel….
6       Plaintiff alleges that GoPro had at most 2,500 drones for sale globally on October
        23, 2016….  In light of the company's ability to track its inventory, it is plausible
7       to infer that [the 2016 Securities Action] Defendants knew that 2,500 drones
        would be insufficient to make Karma globally available at multiple retailers on
8       the launch date.   The inference of scienter is particularly strong, because [the
        2016 Securities Action] Defendants, despite the low number of drones alleged to
9       be available, were priming the market for the sale of 100,000 to 150,000 drones
        during the fourth quarter of 2016.[17]
10

11

12      125.   On January 9, 2018, *Park v. GoPro, Inc., et al.*, No. 3:18-cv-00193-EMC, was

13  filed in the United States District Court for the Northern District of California.  On January 11,

14  2018, *Dye v. GoPro, Inc., et al.*, No. 3:18-cv-00248-WHA, and *Arora v. GoPro, Inc., et al.*, No.

15  3:18-cv-00265-WHO were also filed in the Northern District of California.  On January 24,

16  2018, *Ladd v. Woodman, et al.*, No. 5:18-cv-00533-EJD was also filed in the Northern District of

17  California.  These four actions allege that the officer and directors (collectively, the "2018

18  Securities Actions Defendants") violated the federal securities laws by issuing false and

19  misleading statements to the investing public.  The 2018 Securities Actions allege that between

20  August 4, 2017 and January 5, 2018,[18] inclusive, the 2018 Securities Actions Defendants

21  engaged in a fraudulent scheme and course of conduct designed to hide the truth about the

22  demand for certain of the Company's products.

23

24

25  _____

26  [17] *Id.* at 15.

27  [18] The action styled *Park v. GoPro, Inc., et al.*, No. 3:18-cv-00193-EMC, alleges a class period
    between November 2, 2017 and January 5, 2018, inclusive.

28

**DERIVATIVE ALLEGATIONS**

126.    Plaintiff brings this action derivatively in the right and for the benefit of GoPro to redress injuries suffered by the Company as a direct result of the violations of state law, including breaches fiduciary duty, corporate waste, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.

127.    GoPro is named as a nominal defendant in this case solely in a derivative capacity.  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.  Plaintiff was a stockholder of GoPro at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current GoPro stockholder.  Plaintiff will adequately and fairly represent the interests of similarly-situated GoPro stockholders in enforcing and prosecuting the Company's rights.  Prosecution of this action, independent of the current Board, is in the best interests of the Company.

128.    Plaintiff has not made any demand on the Board to institute this action against the defendants.  Such demand would be futile and useless because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

129.    The current GoPro Board consists of the following eight individuals: defendants Woodman, Bates, Goldman, Gotcher, Lurie, Lyne, Welts, and Zalaznick.

130.    As an initial matter, defendants Woodman and Bates are both are incapable of considering a demand to commence and prosecute this action because they face additional substantial liability as they are named defendants in the 2016 Securities Action.  As noted above, claims against defendants Woodman and Bates, were sustained in the 2016 Securities Action Order.  Also, the Company concedes that defendants Woodman and Bates are not independent by omitting them from the list of Board members considered to be independent under the applicable rules, regulations, and listing standards of NASDAQ.

131.    In fact, all eight of the Board members are conflicted due to the 2016 Securities Action's survival of the motion to dismiss under the rigorous standards for pleading securities fraud.  If the Board were to bring the claims at issue here, it would be tantamount to admitting liability in the 2016 Securities Action.  If the Company presses forward with its rights of action

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1   in this case, then the Company's efforts would undercut or even compromise the defense of the

2   that case, making demand futile.   The Board is therefore incapable of disinterestedly and

3   independently considering a demand to investigate, commence, or vigorously prosecute this

4   action.

5        132.   Moreover, defendant Woodman is independently incapable of objectively

6   considering presuit demand to bring these claims, since he is the current CEO of GoPro,

7   receiving extensive salary and other compensation (over $2 million in 2017), and thus depends

8   upon his position for his livelihood.  Accordingly, defendant Woodman lacks independence due

9   to his interest in maintaining his executive position at GoPro.

10        133.   As of November 7, 2017, defendant Woodman holds or controls approximately

11   75% of all of the Company's stockholders' voting power.   Therefore, if any current Board

12   member took an action antithetical to the wishes of Woodman, he or she would be easily

13   removed from the GoPro Board.  Defendants Goldman, Gotcher, Lurie, and Zalaznick have been

14   heavily compensated for their service on the Board.  In fiscal year 2016, for instance, each of

15   these Board members received total compensation from the Company, as follows:

16           (a)   Goldman - $305,680;

17           (b)   Gotcher - $303,180;

18           (c)   Lurie - $332,119; and

19           (d)   Zalaznick - $248,119 (for only the second half of 2016).

20        134.   New directors defendants Lyne and Welts as well as defendant Bates all stand to

21   make similar amounts in 2018 and going forward.

22        135.   Defendants Woodman, Bates, Goldman, Gotcher, Lurie, Lyne, and Zalaznick all

23   negligently made material misstatements in the Proxy and therefore are subject to a substantial

24   likelihood of liability.

25        136.   ███████████████████████████████

26   ████████████████████████████████████████

27   ████████████████████████████.

28

137.   This makes seven of the eight current Board members from objectively considering a presuit demand to bring these claims against defendant Woodman, and defendant Woodman certainly would not bring a lawsuit against himself.  Thus, presuit demand on the Board to bring suit on behalf of the Company would have been futile.

138.   Plaintiff has not made any demand on stockholders of GoPro to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     GoPro is a publicly traded company with more than 109.2 million Class A and 36.6 million Class B common shares outstanding, held by hundreds or thousands of stockholders;

(b)     making a demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Woodman, McGee, Bates, Gilhuly, Goldman, Gotcher, Lurie, Marks, and Zalaznick for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9**

139.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except any allegation related to fraud, if any.

140.   SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.  Specifically, the Company's Proxy violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information on Karma drone's prospects.

141.    The Proxy was false and misleading when issued because it failed to disclose (among other things) the truth about the Company's financial prospects relating to its Karma drone as well as its HERO5 and HERO6 camera lines.

142.    In the exercise of reasonable care, defendants Woodman, McGee, Bates, Gilhuly, Goldman, Gotcher, Lurie, Marks, and Zalaznick should have known that the statements contained in the Proxy were materially false and misleading.

143.    The misrepresentations and omissions in the Proxy were material to Company stockholders in voting on the matters set forth for stockholder ratification in the Proxy.  The Proxy was an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

144.    The Company was damaged as a result of these defendants' material misrepresentations and omissions in the Proxy.

## COUNT II

### Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

145.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.    During the relevant period, the Individual Defendants disseminated or approved public statements that failed to disclose the risk of the Company to issues relating to inventory, demand for its products, and financial prospects.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.

147.    As explained above, the Company issues the Individual Defendants restricted stock and stock options.

148.    As such, the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

        (a)    employed devices, schemes, and artifices to defraud; and

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

149.    As a result of the Individual Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

### COUNT III

**Against the Individual Defendants for Breach of Fiduciary Duty**

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    Defendant Woodman is the controlling stockholder of GoPro and, as such, owed and continues to owe plaintiff, GoPro, and all other GoPro stockholders the highest obligation of loyalty, good faith, due care, disclosure, candor, and oversight.

152.    By reason of the foregoing, defendant Woodman breached his fiduciary duties—in particular, by abusing his control of the Company to: (i) continue to keep the market unaware of problems with inventory and sales; (ii) continue to receive generous compensation from the Company; and (iii) continue to keep GoPro's stock price artificially high in order to cash out over $6.5 million in stock sales.

153.    Defendants Woodman, McGee, and Bates, at all relevant times, owed and owe fiduciary duties to GoPro and its stockholders.   By reason of their fiduciary relationships, defendants Woodman, McGee, and Bates owed specifically plaintiff, GoPro, and GoPro's stockholders the highest obligation of loyalty, good faith, due care, disclosure, candor, and oversight in the administration of the affairs of the Company, including, without limitation, the oversight of GoPro's compliance with and the duty to conduct a good investigation into known violations of law, regulations, and internal policies.

154.    Defendants Woodman, McGee, and Bates consciously breached their duties by: (i) continuing to keep the market unaware of problems with inventory and sales; (ii) continuing to receive generous compensation from the Company; (iii) continuing to keep GoPro's stock

price artificially high in order to cash out a substantial amount in stock sales; and (iv) allowing a generous severance package for defendant Bates despite the damage he had done to the Company's brand.

155. Each of the Director Defendants owed and owes GoPro the highest obligation of loyalty, good faith, due care, disclosure, candor, and oversight.

156. The Director Defendants owed the duty to oversee defendant Woodman and the Company's senior management and to act on an informed basis through inquiry and review.

157. The Director Defendants were indisputably aware of their duty to monitor because the Corporate Governance Guidelines conferred on the Board the specific responsibility of monitoring defendant Woodman and the Company's senior management and to act on an informed basis through inquiry and review.

158. In conscious disregard of their duties and responsibilities, the Director Defendants consciously failed to monitor their information and reporting systems for compliance relating to the Company's inventory, sales, and product development.

159. Each of the Audit Committee Defendants owed and owes GoPro the highest obligation of loyalty, good faith, due care, disclosure, candor, and oversight.

160. The Audit Committee Defendants owed the duty to monitor the Company's compliance with legal and regulatory requirements and ensure the integrity of accounting and financial processes of the Company.

161. The Audit Committee Defendants were aware of their duty to monitor because the Audit Committee Charter conferred on the Audit Committee the specific responsibility of monitoring the Company's compliance with legal and regulatory requirements (including the drafting and submission of any filing with the SEC) and ensure the integrity of accounting and financial processes of the Company.

162. In conscious disregard of their duties and responsibilities, the Audit Committee Defendants consciously failed to monitor their information and reporting systems for compliance relating to the Company's inventory, sales, and product development.

163.    Defendants Bates, Marks, Gilhuly, Woodman, and McGee all had knowledge of the nonpublic information discussed above and sold shares of GoPro stock on the basis of such information while the price of the Company's shares were artificially inflated.

164.    The inside information was proprietary, nonpublic information regarding the Company's future business prospects known to defendants Bates, Marks, Gilhuly, Woodman, and McGee.

165.    When defendants Bates, Marks, Gilhuly, Woodman, and McGee made the sales alleged of herein, they were in possession of material, adverse, and nonpublic information regarding the Company's important business products representing most of the Company's revenue, was the type of information which these defendants, in accordance with the Code of the Company were specifically barred from trading upon.  The inside information was a proprietary asset belonging to GoPro which was usurped for their benefit.

166.    Defendants Bates', Marks', Gilhuly's, Woodman's, and McGee's use of this information was a breach of internal corporate policies and their fiduciary duties of loyalty and good faith.

167.    Since the use of the Company's own propriety information for their own gain constitutes a disloyal act in breach of defendants Bates', Marks', Gilhuly's, Woodman's, and McGee's fiduciary duties, plaintiff, a stockholder of GoPro and on its behalf, seek restitution from these defendants and an order of this Court imposing a constructive trust and disgorging all profits, benefits, and other compensation obtained by them as a result of their wrongful conduct and fiduciary breaches.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of GoPro, demands judgment, as follows:

A.    Declaring that plaintiff may maintain this action on behalf of GoPro and that plaintiff is an adequate representative of the Company;

B.    Finding the Individual Defendants liable for breaching their fiduciary duties owed to the Company;

1       C.     Finding insider selling defendants Bates, Marks, Gilhuly, Woodman, and McGee

2   liable for breach of fiduciary duty and misappropriation of information;

3       D.     Finding that demand on the GoPro Board is excused as futile;

4       E.     Directing GoPro and the Individual Defendants to take all necessary actions to

5   reform and improve the Company's corporate governance, risk management, and internal

6   operating procedures to comply with applicable laws and to protect GoPro and its stockholders

7   from a repeat of the rampant wrongful conduct described herein;

8       F.     Imposing a constructive trust and awarding the Company the disgorgement of all

9   profits made by insider selling defendants Bates, Marks, Gilhuly, Woodman, and McGee as a

10   result of the fiduciary breaches alleged herein;

11       G.     Awarding plaintiff the costs and disbursements of this action, including attorneys',

12   accountants', and experts' fees; and

13       H.     Awarding such other and further relief as is just and equitable.

14               **JURY TRIAL DEMANDED**

15      Plaintiff hereby demands a trial by jury.

16   Dated: February 13, 2018         ROBBINS ARROYO LLP
                             BRIAN J. ROBBINS

17                         ASHLEY R. RIFKIN

18                           /s/ Brian J. Robbins
                             BRIAN J. ROBBINS

19

20                         600 B Street, Suite 1900
                         San Diego, CA 92101

21                         Telephone: (619) 525-3990
                         Facsimile: (619) 525-3991

22                         E-mail: brobbins@robbinsarroyo.com
                              arifkin@robbinsarroyo.com

23                         Attorneys for Plaintiff

24

25

26

27   1238834

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Wenduo Guo, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violations of Securities Law and Breach of Fiduciary Duty. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 2/10/18

WENDUO GUO